# United States Court of Appeals for the Federal Circuit

---

**PIANO FACTORY GROUP, INC., SWEET 16 MUSICAL PROPERTIES, INC.,**
*Appellants*

**v.**

**SCHIEDMAYER CELESTA GMBH,**
*Appellee*

**ANDREW HIRSHFELD, PERFORMING THE FUNCTIONS AND DUTIES OF THE UNDERSECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**
*Intervenor*

---

2020-1196

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 92061215.

---

Decided:  September 1, 2021

---

ADAM REID STEPHENSON, Adam R. Stephenson, LTD., Scottsdale, AZ, argued for appellants.  Also represented by KEVIN HAWKES, Iptechlaw, Scottsdale, AZ.

MICHAEL J. STRIKER, Delray Beach, FL, argued for appellee.

JENNIFER UTRECHT, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for intervenor. Also represented by BRYAN M. BOYNTON, SCOTT R. MCINTOSH, MELISSA N. PATTERSON; THOMAS L. CASAGRANDE, ERICA JEUNG DICKEY, CHRISTINA J. HIEBER, THOMAS W. KRAUSE, FARHEENA YASMEEN RASHEED Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA.

————————————

Before PROST, BRYSON, and STOLL, *Circuit Judges.*

BRYSON, *Circuit Judge.*

In this trademark case, the appellants, Piano Factory Group, Inc., and Sweet 16 Musical Properties, Inc. (collectively, "Sweet 16"), seek review of a decision of the Trademark Trial and Appeal Board ("TTAB" or "Board") that ordered the cancellation of a trademark registration owned by the appellants. We affirm.

I

A

Appellee Schiedmayer Celesta GmbH makes and sells celestas, which are keyboard instruments that resemble small pianos and are played like pianos. In both instruments, depressing the keys activates felt hammers inside the body of the instrument. The principal difference between the two instruments is that the felt hammers in celestas make tones by striking metal plates, while the felt hammers in pianos strike metal strings.

The facts, as found by the TTAB, are as follows: Schiedmayer Celesta is the successor to a line of German companies that have sold keyboard musical instruments,

including pianos, clavichords, celestas, and glockenspiels, under the Schiedmayer name for nearly 300 years. The company asserts that it is the successor in interest to the "Schiedmayer" trademark, that its predecessors have long sold a variety of keyboard instruments under that name, and that it continues to sell certain keyboard instruments—celestas and glockenspiels—throughout the world. The evidence before the TTAB showed that Schiedmayer celestas have been sold to universities, conservatories, and orchestras in the United States and elsewhere. The owner of a Los Angeles piano store testified that her company has offered sales, rentals, and service of Schiedmayer celestas continuously for the past 50 years. *Schiedmayer Celesta GmbH v. Piano Factory Grp., Inc.*, Cancellation No. 92061215, 2019 WL 4322918, at *2–3 (Sept. 11, 2019).

In 1980, Georg Schiedmayer, the owner of the business, which was then named Schiedmayer & Soehne, stopped making pianos and renamed the company Schiedmayer GmbH & Co. KG. At that time, Mr. Schiedmayer entered into a joint venture with another German company, Rud. Ibach GmbH, under which the Ibach company manufactured pianos under the Schiedmayer name. That arrangement ended quickly, however, and Mr. Schiedmayer shifted his focus to making celestas. The "Schiedmayer" trademark was not sold, assigned, or otherwise transferred to Ibach or any other entity. At some point, the Ibach company entered into an agreement with the Kawai Company under which Kawai produced some pianos carrying the Schiedmayer name. That arrangement was not authorized by Schiedmayer, however.[1]

---

[1]     Sweet 16 asserted below, and continues to assert on appeal, that Mr. Schiedmayer transferred or assigned trademark rights to Ibach or Kawai or both. The Board, however, found there had been no such transfer or assignment. *Piano Factory*, 2019 WL 4322918, at *2.

After Georg Schiedmayer died in 1992, his widow, Elianne Schiedmayer, became the sole owner of Schiedmayer GmbH & Co. KG. In 1995, she founded a new company that became the appellee, Schiedmayer Celesta, which continues to sell celestas worldwide.

Appellant Sweet 16 Musical Properties, Inc., acquired the assets of Piano Factory Group, Inc., in 2006 and sells pianos from retail outlets in the Los Angeles area under the name "Hollywood Piano." Despite the name "Piano Factory," none of the related corporations manufacture pianos; they are purely retail outlets.

The owner of those companies, Glenn Treibitz, believed that the "Schiedmayer" mark had been abandoned for pianos and decided to use the mark in his business. In 2002, he acquired the domain name "schiedmayer.com" and filed an application to register the "Schiedmayer" mark for pianos. The Patent and Trademark Office issued a registration for that mark on the principal register in November 2007. Piano Factory Group, Inc., assigned the registration to Sweet 16 Musical Properties, Inc.

It was the practice at Sweet 16's Hollywood Piano stores to purchase "no-name" pianos from China and to affix labels on them, including the Schiedmayer label. The pianos labeled "Schiedmayer" would then be sold as Schiedmayer pianos.

The practice of falsely branding "no-name" pianos, Mr. Treibitz testified, is not uncommon in the industry. The falsely branded pianos are referred to as "stencil pianos," many of which are made in Indonesia or mainland China. Mr. Treibitz admitted that a "classic example of stencil pianos is when manufacturers produce a cheap-end piano that has a German sounding name." *Piano Factory*, 2019 WL 4322918, at *4 (quoting J.A. 831). He also agreed that "many buyers are deceived into believing that these pianos are produced in famous geographical locations that are recognized for their production of quality instruments, most

notably Germany."[2]  J.A. 831–32.  Mr. Treibitz testified that Sweet 16 sold approximately 29 stencil pianos bearing the "Schiedmayer" mark between 2007 and 2018, although that estimate was not supported by business records, but was based only on Mr. Treibitz's general recollection.

B

In 2015, Schiedmayer Celesta filed a cancellation petition with the TTAB, seeking to cancel Sweet 16's registration for the "Schiedmayer" mark.  The cancellation petition alleged that the mark falsely suggested a connection with Schiedmayer Celesta, in violation of section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a).  Following discovery and briefing, the Board issued an opinion granting the petition to cancel the registration.

The Board first found that appellee Schiedmayer Celesta had standing to bring the cancellation proceeding. Schiedmayer Celesta, the Board found, "is named after the Schiedmayer family known for keyboard musical instruments, [and] is owned by a member of that family and uses Schiedmayer as a trademark for keyboard musical instruments."  *Piano Factory*, 2019 WL 4322918, at *6.  As such, the Board concluded, appellee "has a personal stake in this proceeding, and is not an intermeddler."  *Id.*

On the merits, the Board upheld the appellee's false suggestion of a connection (or "false association") claim. The Board applied the four-part test for a false association bar to registration that was derived from this court's opinion in *University of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co.*, 703 F.2d 1372 (Fed. Cir. 1983).  In so doing, the Board found (1) that Sweet 16's registered

---

2    A Hollywood Piano advertisement introduced into evidence touted its Asian-sourced "Schiedmayer" pianos as having "German design, German strings, German pinblock, [and] German hammer felt."  J.A. 1255.

"Schiedmayer" mark is effectively the same as the appellee's name and identity; (2) that the registered mark points uniquely and unmistakably to the appellee; (3) that the appellee is not connected with the activities performed by Sweet 16 under the mark; and (4) that the appellee's name or identity is of sufficient fame or reputation that when Sweet 16 uses the mark in connection with its sales and rentals of pianos, a connection with the appellee would be presumed.[3] *Piano Factory*, 2019 WL 4322918, at *6–10.

Based on those findings, the Board concluded that because Sweet 16 has used the appellee's "unique name and identity in connection with keyboard musical instruments similar to those for which [Schiedmayer Celesta] and the Schiedmayer family are famous," Sweet 16's use of the mark "will falsely suggest a connection between [Schiedmayer Celesta] and [Sweet 16]." *Id.* at *14.

---

[3]    A false association claim under section 2(a) of the Lanham Act is similar in some respects to a likelihood of confusion claim under section 2(d) of the Act, although the statutory protection against a false suggestion of a connection is designed not just to protect against deceptive use in commerce, but "to protect persons and institutions from exploitation of their persona." *Bridgestone/Firestone Res., Inc. v. Auto. Club de L'Ouest de la France*, 245 F.3d 1359, 1363 (Fed. Cir. 2001); *see also Notre Dame*, 703 F.2d at 1375. Even in the absence of a likelihood of confusion as to the source of goods, we have stated that under section 2(a), "one's right of privacy, or the related right of publicity, may be violated." *Id.*; *see Buffett v. Chi-Chi's, Inc.*, 226 U.S.P.Q. 428, 429 (TTAB 1985) ("[T]hough there may be no likelihood of confusion as to the source of the goods, even under a theory of sponsorship or endorsement, nevertheless an opposer's right to control the use of its identity may be violated.").

In addressing Sweet 16's defense of laches, the Board found that the seven and one-half year period of delay between Sweet 16's registration of the "Schiedmayer" mark and Schiedmayer Celesta's filing of its petition for cancellation of that mark was "fairly long, and in the absence of extenuating circumstances or an excuse, unreasonable." *Id.* at *11. However, the Board further found that Sweet 16 had not met its burden of showing prejudice as a result of the delay.

The Board observed that "the entirety of [Sweet 16's] argument that [it has] suffered material prejudice" is that it had "sold and rented Schiedmayer branded pianos continuously for seven years." *Id.* at *12. The only evidence of any marginal expenses incurred in selling the Schiedmayer-labeled pianos, the Board found, was the cost of buying Schiedmayer labels from trophy shops or decal makers to place on the no-name pianos. The Board further found that relabeling those pianos with a name other than Schiedmayer "would be quick, easy and inexpensive." *Id.* at *13. Accordingly, the Board found that the delay in seeking cancellation did not entail the forfeiture of any monetary investment or the incurrence of any other financial injury that likely would have been avoided if the cancellation proceeding had been initiated earlier.

## II

On appeal, Sweet 16 raises a constitutional challenge to the composition of the TTAB panel that decided this case. Sweet 16 contends that the administrative trademark judges ("ATJs") who sat on the panel were appointed in violation of the Appointments Clause of Article II of the Constitution, and that the Board's decision therefore must be vacated. Appellants' Opening Br. 18–19. The Acting

Director of the Patent and Trademark Office, as intervenor, argues that the ATJs were lawfully appointed.[4]

The parties' briefs in this case were filed prior to the Supreme Court's decision in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021).  In that case, the Court analyzed the statutes governing *inter partes* review proceedings before the Patent Trial and Appeal Board ("PTAB").  In light of the authority conferred on the PTAB's administrative patent judges ("APJs") by those statutes, the Court concluded that the APJs must be regarded as principal officers of the United States.  The Court held that, absent a modification of the APJs' authority, the APJs could constitutionally perform their duties only if they were appointed by the President and confirmed by the Senate.

Sweet 16 argues that in view of the Supreme Court's decision in *Arthrex*, the ATJs must also be considered "principal officers" of the United States.  Because the ATJs are not appointed by the President and confirmed by the Senate, Sweet 16 contends that they have been unconstitutionally appointed.[5]

---

[4]    The appellee defers to the intervenor's presentation on this issue.  *See* Appellee's Br. 22; Supplemental Br. of Appellee 2.

[5]    The intervenor argues that Sweet 16 forfeited its Appointments Clause challenge because it failed to raise that argument before the TTAB.  There is support for that argument.  S*ee Ryder v. United States*, 515 U.S. 177, 182–83 (1995); *In re DBC*, 545 F.3d 1373, 1378–79 (Fed. Cir. 2008).  In *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1326–27 (Fed. Cir. 2019), *vacated and remanded sub nom. United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), we exercised our discretion to decide the Appointments Clause issue despite Arthrex's failure to raise the issue before the PTAB.  We declined to find waiver because the

The Supreme Court in *Arthrex* acknowledged that the Director of the Patent and Trademark Office, a Presidential appointee, supervises the APJs in many respects, having powers of "administrative oversight" over the APJs through mechanisms such as fixing their pay rate, controlling the decision whether to institute *inter partes* review, selecting the APJs to serve on *inter partes* review panels, promulgating regulations governing *inter partes* review, issuing prospective guidance on patentability issues, and designating particular PTAB decisions as "precedential" for future panels.  141 S. Ct. at 1980.

The Court found, however, that the Director's supervisory authority came to a halt with respect to "the one thing that makes the APJs officers exercising 'significant authority' in the first place—their power to issue decisions on patentability." *Id.*  In that regard, the Court held, neither the Director nor any other Executive Branch official had the power to direct and supervise the work of the APJs.  It was that lack of supervisory control over the decision-making process of the APJs that created the Appointments Clause problem.  *Id.* at 1980–81.

The Court identified two statutory impediments to the Director's exercise of control over decision-making in *inter partes* review proceedings.  First, section 6(c) of the Patent Act, 35 U.S.C. § 6(c), requires that *inter partes* review proceedings be heard by panels consisting of a minimum of three members.  Furthermore, the statute specifies that

---

Appointments Clause issue was one of exceptional importance and because it would have been futile for Arthrex to raise that constitutional issue before the PTAB.  *Id.*  In this case, we elect to follow the same course.  The Appointments Clause issue raised by Sweet 16 is important, and even though Congress has taken steps to address that issue, Sweet 16 contends that those steps have not mooted the issue going forward.

only the PTAB may grant rehearings of PTAB decisions. That scheme, the Court concluded, gives APJs the power to render a final decision on behalf of the United States "without any . . . review by their nominal superior or any other principal officer in the Executive Branch." *Arthrex*, 141 S. Ct. at 1981.[6]

Second, section 318(b) of the Act, 35 U.S.C. § 318(b), requires the Director to comply with the PTAB's decisions by canceling claims according to those decisions, affirming claims according to those decisions, or adding to the patent any new or amended claims determined by the PTAB to be patentable. Because that statute uses mandatory language, the Court held that it denies the Director the authority to override the decisions of the PTAB on issues of patentability. *Arthrex*, 141 S. Ct. at 1980–81.

The Court then turned to framing a remedy for the constitutional violation. Consistent with the reasoning underlying its finding of an Appointments Clause violation, the Court held that section 6(c) of the Patent Act could not constitutionally be enforced "to the extent that its requirements prevent the Director from reviewing final decisions rendered by APJs." *Id.* at 1987. However, the Court held that the Director, if freed of that unconstitutional limitation on his authority, would have "the authority to provide for a means of reviewing PTAB decisions," and that the Director could "review final PTAB decisions and, upon review, . . . issue decisions himself on behalf of the Board." *Id.*

---

[6]    In our decision in the *Arthrex* case, we pointed out that although the Director is considered a member of the PTAB and can appoint himself to any panel, he has only one vote on a panel of three and therefore cannot control the disposition of any case in which he is in the minority. 941 F.3d at 1330; *see also Arthrex*, 141 S. Ct. at 1981.

The Court concluded that the proper remedy for the Appointments Clause violation was to strike down section 6(c), which insulated PTAB decisions from review by the Director. Doing so, the Court ruled, would be sufficient to render the APJs "inferior officers" for purposes of the Appointments Clause. *Id.* at 1987.[7] In that circumstance, review by the Director would "follow the almost-universal model of adjudication in the Executive Branch," and "aligns the PTAB with the *other* adjudicative body in the PTO, the Trademark Trial and Appeal Board." *Id.* The Court thus effectively confirmed that in light of the Director's authority over decisions of the TTAB, the statutory scheme governing TTAB decision-making is not subject to the Appointments Clause problem the Court identified with regard to the PTAB.

The Director's role in TTAB adjudications was one of the subjects addressed in the Trademark Modernization Act of 2020, Pub. L. No. 116-260, div. Q, tit. II, subtit. B, § 228, 134 Stat. 1182, 2209–10. Among other things, that Act explicitly confirmed the Director's authority to review decisions of the TTAB. *See* 15 U.S.C. §§ 1068, 1070, 1092. In view of the Supreme Court's analysis in *Arthrex*, the current trademark statutes plainly render the ATJs "inferior officers," making their appointments by the head of a department, i.e., the Secretary of Commerce, lawful.

---

[7]    Part III of the Chief Justice's opinion, which addresses the remedy issue, was joined by only three other members of the Court. However, the remedial holding in the plurality opinion had the support of a majority of the justices, as three of the dissenting justices agreed with the plurality that after the offending portions of section 6(c) were struck down, the Director's authority over PTAB decisions was sufficient to satisfy the Appointments Clause. *See Arthrex*, 141 S. Ct. at 1997 (Breyer, J., concurring in the judgment in part and dissenting in part).

The wrinkle here is that this case was decided by the Board prior to the enactment of the Trademark Modernization Act of 2020. Sweet 16 argues that in light of the statutory structure in place when the Board decided this case in 2019, the Board's ATJs enjoyed the status of principal officers at that time, and thus their appointments were unconstitutional.

The intervenor disagrees, as do we. As the intervenor points out, even before the enactment of the Trademark Modernization Act of 2020 the trademark statutes gave the Director significantly more supervisory control over administrative trademark judges and their decisions than over administrative patent judges in *inter partes* review proceedings.

In the trademark context, the Director has many of the same administrative oversight responsibilities concerning the administrative judges as in the patent context. Where the two systems diverge is with respect to the Director's supervisory authority in deciding individual cases.

As we explained in our decision in *Arthrex*, the effect of sections 6(c) and 318(b) of the Patent Act is to deprive the Director of the power to review and reverse the decisions of the PTAB. 941 F.3d at 1329–30; *see also Arthrex*, 141 S. Ct. at 1981. But there are no analogous statutory restraints on the Director's authority in the trademark context. The broad statutory authority given to the Director by section 41 of the Lanham Act, 15 U.S.C. § 1123, to "make rules and regulations, not inconsistent with law, for the conduct of proceedings in the Patent and Trademark Office" is not subject to the requirements that the TTAB sit in panels of three or that the Director cancel registrations if the TTAB finds that a registration should not have issued.

Prior to 1999, section 17 of the Lanham Act, 15 U.S.C. § 1067 (1994 ed.), required the TTAB to sit in panels of at least three, as was the case for the PTAB before the

Supreme Court's decision in *Arthrex*.  That requirement was eliminated for the TTAB by the Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. 106-113, div. B, app. I, tit. IV, § 4716, 113 Stat. 1501, 1501A-580.  As amended in 1999, section 1067 is silent as to the composition of the TTAB panel that decides each case.  Section 1067(a) provides that in all actions brought before the Board, the Director "shall direct a Trademark Trial and Appeal Board to determine and decide the respective rights of registration."  And section 1067(b) provides that the Board shall include the Director, the Deputy Director, the Commissioner for Patents, and the Commissioner for Trademarks, as well as administrative trademark judges appointed by the Secretary of Commerce.  As a result, the Director has discretion regarding the size and composition of TTAB panels, which the Director can exercise pursuant to his authority to establish rules and regulations governing procedures before the TTAB, *see* 15 U.S.C. §1123.

Accordingly, in the trademark context, unlike in the pre-*Arthrex* patent context, the Director has for more than twenty years had the authority to direct that any Board case be decided by a single member of the TTAB, either initially or on rehearing.[8]   And because the Director is a

---

[8]   Sweet 16 contends that even if the Director in 2019 had the power to unilaterally "decide" a case, that power did not include the power to rehear or reconsider PTAB decisions. We disagree. The Director's broad supervisory authority under 15 U.S.C. §§ 1123 and 1068 (2000 eds.), together with the absence of any limitation on the composition of TTAB panels, *see id.* § 1067, indicates that the Director in 2019 had the power both to unilaterally decide a case in the first instance and to decide a case on rehearing by overriding an initial TTAB decision. To the extent that Sweet 16 relies on the absence of express authority for the

standing member of the TTAB, he enjoys the authority to designate himself as the sole member of a TTAB rehearing panel, thereby allowing him to review and reverse decisions of a panel of ATJs.

Furthermore, section 18 of the Lanham Act, 15 U.S.C. § 1068, has long provided the Director with broad authority to refuse to register a mark or cancel a registration. While that authority must be exercised "as the rights of the parties under this chapter may be established in the proceedings," the Director's broad authority under sections 17 and 41 of the Lanham Act, 15 U.S.C. §§ 1067 and 1123, to take control of a TTAB case provides a mechanism by which the Director may establish "the rights of the parties." The regulations governing TTAB proceedings confirm that the Director may "invoke [his] supervisory authority . . . in appropriate circumstances." 37 C.F.R. § 2.146(a)(3).

At oral argument, Sweet 16 contended that, as of 2019, 15 U.S.C. § 1092 insulated from the Director's review TTAB decisions canceling trademark registrations on the supplemental register. Sweet 16 focused on language in that statute that a trademark registration "shall be canceled by the Director" if it is "found after a hearing before the Board that the registrant is not entitled to registration, or that the mark has been abandoned." Even though this case concerns a mark published on the principal register, not the supplemental register, Sweet 16 contends that

Director to rehear TTAB decisions, we reject that contention, as "[t]he power to reconsider is inherent in the power to decide." *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1360 (Fed. Cir. 2008); *see also Dayley v. United States*, 169 Ct. Cl. 305, 308 (1965) ("[U]nless there is legislation to the contrary it is the inherent right of every tribunal to reconsider its own decisions within a short period after the making of the decision and before an appeal has been taken or other rights vested.").

section 1092 created a constitutional defect in the appointment of ATJs because the Director could not override the TTAB's cancellation of a supplemental mark. According to Sweet 16, any conveyance of power that is not subject to supervision by a principal officer, no matter how remote from the action being challenged, poisons the administrative judge's appointment for all purposes.

The mandatory language in section 1092 is of no consequence in light of the Director's authority to rehear the decisions of TTAB panels. That is clear from the remedy ordered by the Supreme Court in *Arthrex*. Despite a similar provision in the Patent Act, 35 U.S.C. § 318(b), stating that the Director "shall issue and publish a certificate" canceling, affirming, or amending claims in accordance with the PTAB's decision, the Court left section 318(b) untouched when fixing the Appointments Clause problem, and instead rendered unenforceable section 6(c)'s limitations on the composition of PTAB panels.

The end result of the Court's decision in *Arthrex* was to create a regime very similar to the trademark statutory scheme in place as of 2019. There was at that time no limitation on the composition of TTAB panels, *see* 15 U.S.C. § 1067, and the Director had broad authority to control TTAB proceedings, *see id.* § 1123 (2000 ed.). The Supreme Court held highly similar conditions sufficient to render APJs inferior officers despite the "shall issue and publish" language of section 318(b). The same result necessarily follows with respect to ATJs and the language of 15 U.S.C. § 1092 (2006 ed.).

For those reasons, we agree with the intervenor that as of 2019 the Director had the authority to regulate not only the procedures employed by the TTAB, but also the substance of the TTAB's decision-making process.

As noted, the Trademark Modernization Act of 2020 made the Director's authority vis-à-vis the decisions of the TTAB indisputably clear. In a section of that Act entitled

"Amendments to Confirm Authority of the Director," the Act explicitly provides that the Director has "the authority to reconsider, and modify or set aside, a decision of the Trademark Trial and Appeal Board." 134 Stat. at 2209–10 (codified at 15 U.S.C. § 1068); *see also* 15 U.S.C. § 1070 ("The Director may reconsider, and modify or set aside, a decision of the Trademark Trial and Appeal Board under this section."); *id.* § 1092 (Following an adverse decision regarding a mark on the supplemental register, the registration shall be canceled by the Director "unless the Director reconsiders the decision of the Board, and modifies or sets aside, such decision."). If there were any doubt as to the status of ATJs as inferior officers prior to 2020, the 2020 legislation removed that doubt.

Sweet 16 argues that the enactment of the 2020 legislation indicates that prior to 2020, the Director lacked the authority explicitly defined by the 2020 legislation, and that it would be improper to give that statute retroactive effect. In fact, however, the 2020 legislation itself makes clear that it merely confirmed, and did not alter, the Director's authority. The section of the 2020 legislation adding language concerning the Director's authority expressly refers to "Confirm[ing] [the] Authority of the Director." 134 Stat. at 2209. In addition, a note to the legislation states that it "shall not be construed to mean that the Director lacked the authority to reconsider, and modify or set aside, a decision of the Trademark Trial and Appeal Board before the date of enactment of this Act." *Id.* at 2210. The House Report on the legislation confirms that it was "understood that this authority already exists in the trademark context," and that "the statutory additions should be understood to be confirmatory only." H.R. Rep. No. 116-645, at 22 (2020).

The 2020 legislation does not solve the Appointments Clause issue going forward, Sweet 16 argues, because it does not create an explicit right for the Director to order rehearing of TTAB panel decisions, and thus does not

guarantee litigants the opportunity to obtain Director review of adverse TTAB decisions.  That argument is unpersuasive for two reasons.  First, the language of the 2020 amendments explicitly recognizes that the Director has the authority to rehear TTAB decisions.  Thus, the Director clearly has the authority to provide for rehearing of TTAB decisions if he elects to provide for a remedy by regulation or rule.  Second, the Appointments Clause was intended to prevent unappointed officials from wielding too much authority, not to guarantee procedural rights to litigants, such as the right to seek rehearing from the Director.  It is therefore irrelevant whether the Director has implemented a procedure for rehearing TTAB decisions.  What the 2020 legislation makes clear is that the Director has the right to exercise supervisory authority over ATJs with respect to particular decisions, including by rehearing TTAB decisions; whether the Director elects to exercise that authority does not affect the status of ATJs as inferior officers under the Appointments Clause.

In sum, the 2020 legislation confirms that the Director's authority to review TTAB decisions was the same before the legislation as afterwards.  Thus, considering the Supreme Court's favorable reference to the constitutional status of ATJs as inferior officers of the United States, we reject Sweet 16's Appointments Clause challenge to the legitimacy of the TTAB panel that decided this case.

## III

On the merits, Sweet 16 raises a number of challenges to the Board's decision, none of which we find persuasive.

## A

First, Sweet 16 challenges the Board's decision with respect to Sweet 16's defense of laches.  Appellants' Opening Br. 15–18.  The Board rejected that defense on the ground

that Sweet 16 had suffered no material prejudice from the appellee's delay in initiating the cancellation proceeding.[9]

Sweet 16 does not dispute the Board's finding that the delay did not cause it any investment loss or other similar economic injury. *See* Appellants' Opening Br. 15. Instead, Sweet 16 claims prejudice based on the effect that an adverse decision in the cancellation proceeding could have in a potential trademark infringement action that Schiedmayer Celesta might bring against Sweet 16 in the future.

Schiedmayer Celesta and the intervenor both contend that Sweet 16 waived that claim by never raising it before the Board. Sweet 16 acknowledges that it did not raise that claim before the Board. It argues, however, that it should not be deemed to have waived the issue, because "the material prejudice to the Appellant is a result of the decision of the Board, which did not exist until it was handed down." Appellants' Reply Br. 18.

Sweet 16's argument is nonsensical. Prejudice from an error in the course of litigation typically flows from an adverse decision that is the result of the error. If a party could excuse its failure to seek correction of an error on the ground that the adverse decision had not yet occurred at the time of the error that led to that decision, there would seldom be a case in which a party would be deemed to have waived a claim of error.

This is a clear-cut case of failure to make an argument to the original tribunal and an effort to raise that argument for the first time on appeal. There are no exceptional

---

[9]    As the Board explained, a defendant who asserts laches must show (1) unreasonable delay by the plaintiff in asserting its rights and (2) material prejudice attributable to that delay. *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992).

circumstances in this case that would justify our overlooking Sweet 16's failure to raise its new theory of prejudice. We hold that Sweet 16 forfeited its argument by not timely raising it before the Board.

## B

Sweet 16 next contends that the Board erred in "defining the petitioner" in the cancellation proceeding.  Appellants' Opening Br. 19–21.  Sweet 16 complains that the Board treated the "Schiedmayer" mark as pointing uniquely and unmistakably to the Schiedmayer family and the family's businesses "carried on by people with the last name of Schiedmayer in Germany and the US dating back almost 300 years," not just to Schiedmayer Celesta, the only business participating in the cancellation proceeding in this case.  *Id.* at 20.  For the Board to have jurisdiction to decide the rights of Ms. Schiedmayer or "any other unidentified person with the last name Schiedmayer claiming an interest in the surname applied to keyboard instruments," such persons must be joined in the cancellation action, according to Sweet 16.  *Id.*  Absent such joinder, Sweet 16 argues, "the Board possessed no personal jurisdiction to make a decision adjudicating their rights as individuals at the time of its decision."  *Id.* at 20–21.

A petition to cancel the registration of a mark may be filed "by any person who believes that he is or will be damaged" by the registration of the mark on the principal register.  15 U.S.C. § 1064.  Thus, any party with a "real interest in the proceeding" and a "reasonable belief in damage" may seek cancellation of a registration.  *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1304–06 n.1 (Fed. Cir. 2020); *Australian Therapeutic Supplies Pty. v. Naked TM, LLC*, 965 F.3d 1370, 1373–74 (Fed. Cir. 2020).  Moreover, it is not necessary for that party to join every other party that might have such an interest.  *See Universal Oil Prods. Co. v. Rexall Drug & Chem. Co.*, 463 F.2d 1122, 1124 (CCPA 1972) (parent company that could demonstrate an

interest in the proceeding need not join a subsidiary company that had control of the trade name).

To the extent Sweet 16 is arguing that Schiedmayer Celesta lacked standing to bring the cancellation proceeding, the Board correctly rejected that argument. Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), provides in pertinent part that a trademark shall be refused registration on the principal register if it "falsely suggest[s] a connection with persons, living or dead, institutions, beliefs, or national symbols." A party asserting a false association bar to registration under section 2(a) need not have proprietary rights to a name as long as the party has a reasonable belief that it will be or is being damaged by the false suggestion of a connection between a person and the challenged mark. *See Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 823 F.2d 490, 493–94 (Fed. Cir. 1987); *Estate of Biro v. Bic Corp.*, 18 U.S.P.Q.2d 1382, 1385 (TTAB 1991); 1 Jeffrey A. Handelman, *Handleman's Guide to TTAB Practice* § 5.06[E], at 5-37 (2d ed. 2021). Schiedmayer Celesta contends that Sweet 16's use of the "Schiedmayer" mark on stencil pianos injures the reputation of the Schiedmayer brand. That contention clearly establishes the requisite reasonable apprehension of injury.

To the extent Sweet 16 is contending that the Board erred in exercising jurisdiction in this case because other potential parties were not joined in the cancellation proceeding, we again disagree. As the Board pointed out, this is not a case in which other Schiedmayer companies or individuals appear to have interests that conflict with the interests of Schiedmayer Celesta. Because Schiedmayer Celesta is the sole corporate successor to the German Schiedmayer companies, and because Ms. Schiedmayer is the sole owner of Schiedmayer Celesta, it was proper for the Board to go forward with the cancellation proceeding without requiring the joinder of any other entities.

C

Sweet 16's next claim is that the Board erred in defining the goods at issue as being "keyboard musical instruments" rather than the goods stated on the registration certificate, i.e., "pianos." Appellants' Opening Br. 21–23. Relatedly, Sweet 16 contends that the Board erred by characterizing Schiedmayer Celesta's business as manufacturing and selling "keyboard musical instruments" rather than manufacturing and selling celestas and glockenspiels. *Id.* at 28. The implication of that argument is that if the Board had adopted a narrower definition of the goods at issue, Sweet 16 would have been free to register and use the "Schiedmayer" mark, since that mark would be used in connection with products different from the products made and sold by Schiedmayer Celesta.

Sweet 16's argument misapprehends the nature of the section 2(a) bar to registration. Unlike section 2(d), the false association component of section 2(a) is not directed to the likelihood of confusion regarding the source of goods. Instead, it is directed to the false suggestion that there is a connection between a particular person and another's goods or services. 3 J. Thomas McCarthy, *McCarthy on Trademarks*, § 19:76, at 19-274 (5th ed. 2021). It is therefore not necessary for application of the false association bar that the registration be directed to the same or similar goods as those of the complaining party, as long as the registered mark falsely suggests a connection with a person other than the registrant. For that reason, it does not matter that Sweet 16 limited its registration of the Schiedmayer mark to pianos, as long as the use of that mark falsely suggested an association between Sweet 16's Schiedmayer-branded pianos and appellee Schiedmayer Celesta.

As discussed in Part III-D below, the similarity between pianos and celestas exacerbates the false connection between the registered mark and Schiedmayer Celesta.

Even if consumers understood the differences between celestas and pianos, that would not prevent them from concluding that there was a connection between Schiedmayer Celesta and Sweet 16's Schiedmayer-branded pianos.  In short, Sweet 16's limitation of its registration to pianos did not immunize it from the section 2(a) bar for false association.

## D

Finally, Sweet 16 challenges the Board's application of the four-factor test for determining whether a mark should be canceled because it falsely suggests a connection with another person or entity.

The four factors, as related to goods, have been identified as follows:

> (1) The mark is the same as, or a close approximation of, the name or identity previously used by another person;

> (2) the mark would be recognized as pointing uniquely and unmistakably to that person;

> (3) the person named by the mark or using the mark is not connected with the activities performed by the applicant under the mark; and

> (4) the prior user's name or identity is of sufficient fame or reputation that a connection with the person would be presumed when the applicant's mark is used to identify the applicant's goods.

*In re Jackson*, 103 U.S.P.Q.2d 1417, 1419 (TTAB 2012); *see In re Wielinski*, 49 U.S.P.Q.2d 1754, 1757 (TTAB 1998); 3 *McCarthy on Trademarks*, § 19:76, at 19-276; *see generally Notre Dame*, 703 F.2d at 1376–1377.  It is undisputed that factors (1) and (3) are satisfied in this case.  Sweet 16 contests only factors (2) and (4).

Sweet 16 makes three arguments regarding those disputed factors. First, with respect to factor (2), Sweet 16 argues that in light of third-party uses of the Schiedmayer name, the Board erred in finding that the "Schiedmayer" mark points uniquely and unmistakably to the appellee. Appellants' Opening Br. 23–28. Second, with respect to factor (4), Sweet 16 argues that the appellee did not have sufficient fame and reputation at the time the mark was registered such that a connection with the appellee would be presumed. *Id.* at 28–30. And third, also with respect to factor (4), Sweet 16 argues that the Board erred in determining that the fame or reputation of the appellee extended to pianos, as opposed to being limited to just celestas and glockenspiels. *Id.* at 30. We review the Board's factual findings on each of those three issues for substantial evidence. *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085–86 (Fed. Cir. 2000).

1. As to the first point, Sweet 16 argues that it offered evidence that "numerous other entities" between 1980 and the present have used the mark "Schiedmayer" for pianos and that the Board ignored that evidence. Appellants' Opening Br. 24. In fact, however, the Board assessed that evidence and concluded that there was no proof that anyone other than Sweet 16 and the appellee is currently using the mark for keyboard musical instruments in the United States. To the extent that others may have used the mark in the United States in the past, the Board found there was no evidence that any such use "continues or that it had any effect on the public perception of the 'Schiedmayer' name as referring to" the appellee. *Piano Factory*, 2019 WL 4322918, at *8. Sweet 16's evidence to the contrary, the Board found, was based on printed publications and Internet printouts, which the Board held were hearsay, and "not admissible for the truth of the matters asserted therein." *Id.* at *8 n.14.

Inadmissibility aside, the evidence Sweet 16 proffered does not undermine the Board's finding on this issue. At

most, Sweet 16's evidence shows that for some period of time during Georg Schiedmayer's joint venture with the Ibach company, Ibach produced Schiedmayer-branded pianos, and that Ibach later arranged for other companies, including Kawai, to produce pianos under the Schiedmayer label. But the appellee introduced evidence that the Schiedmayer company never transferred rights in its trademark to Ibach and never authorized Ibach to permit Kawai or any other company to produce pianos bearing the Schiedmayer label. That evidence included testimony from Ms. Schiedmayer, widow of Georg Schiedmayer, that the "trademark Schiedmayer was never sold, licensed, assigned or in any way transferred" to Ibach or Kawai. *Id.* at *2. The evidence also included testimony from a German intellectual-property attorney that "based on his search of German trademark registrations, 'no company bearing the name [Ibach] ever obtained any rights to the trademark Schiedmayer in Germany.'" *Id.*

The only non-hearsay evidence on this issue to which Sweet 16 points is testimony from a piano store owner who declared that he was involved in purchasing four Schiedmayer-branded pianos from the Ibach company and Kawai USA during the period between 1981 and 1989. That evidence, however, is not contrary to the appellee's assertion that some Schiedmayer pianos were produced in cooperation with the Ibach company and that later sales by Ibach and third parties such as Kawai were not authorized by the Schiedmayer company.

Contrary to the implication of Sweet 16's argument, the fact that there may have been limited use of the Schiedmayer name by other piano manufacturers some years before Sweet 16's application to register the mark in its own name does not immunize Sweet 16 from a false association claim. The alleged third-party uses of the mark were for goods closely related to the products that the Schiedmayer companies, including Schiedmayer Celesta, continued to sell. The Board did not find that the sale of

pianos pursuant to the joint venture between Georg Schiedmayer and the Ibach company undermined the connection between the "Schiedmayer" mark and the Schiedmayer companies.  Nor did it find that Kawai's sales of pianos under the Schiedmayer name for a period of time in the 1990s had that effect.

Those limited third-party uses tended to support the finding that consumers continued to associate the mark with the Schiedmayer companies and their corporate successor, Schiedmayer Celesta.  *See In re Pedersen*, 109 U.S.P.Q.2d 1185, 1195–96 (TTAB 2013) (third-party uses that refer to the plaintiff do not by themselves undermine a finding that the name in question pointed uniquely to the plaintiff).  The same is true in the case of a holdover licensee, whose activities imply, wrongly, that they are affiliated with the entity that gave them permission to use the mark.  *See, e.g.*, *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 44 (2d Cir. 1986).  Thus, Sweet 16's evidence, even if accepted as admissible, does not establish that the Board erred in finding that the name "Schiedmayer" points uniquely and unmistakably to the appellee.

2.  As to the second point, Sweet 16 argues that the evidence failed to show that Schiedmayer Celesta enjoyed the requisite fame or reputation as of the date of Sweet 16's registration.

In considering a false association claim, the Board is required to assess the facts as of the time the mark was registered.  *Hornby v. TJX Cos., Inc.*, 87 U.S.P.Q.2d 1411, 1424 (TTAB 2008); *Consorzio del Prosciutto di Parma v. Parma Sausage Prods., Inc.*, 23 U.S.P.Q.2d 1894, 1898–99 (TTAB 1992); *Bd. of Trustees of the Univ. of Ala. v. BAMA-Werke Curt Baumann*, 231 U.S.P.Q. 408, 410–11 (TTAB 1986).  Sweet 16 complains that in making a finding on that issue, the Board erred by relying on evidence that predated or post-dated Sweet 16's registration date of 2007.

The Board did not err in relying on recent publications or the history of the Schiedmayer companies to draw inferences as to Schiedmayer Celesta's fame as of 2007. *See Hornby*, 87 U.S.P.Q.2d at 1416 (Evidence "after the date of issuance of respondent's registration may tell us something about the fame or reputation as of that date."); *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q.2d 1705, 1715 (TTAB 1989) (Evidence concerning the significance of a word "before and after the relevant time periods may shed light on its significance during those time periods."), *rev'd on other grounds*, 284 F. Supp. 2d 96 (D.D.C. 2003).

Any publication will necessarily reflect facts that occurred prior to the date of the publication. And the past history of a company frequently bears importantly on that company's current fame and reputation. Based on the evidence as a whole, the Board found that the Schiedmayer name enjoyed fame and reputation in the field of keyboard musical instruments throughout the period that included the time that Sweet 16 registered the "Schiedmayer" mark. Substantial evidence supports the Board's finding on that issue.

3. As to the third point, Sweet 16 argues that in assessing the appellee's fame and reputation, the Board disregarded the differences between pianos and celestas.

The Board concluded that in light of the history of the Schiedmayer brand, the fame and reputation of the Schiedmayer Celesta company extended to keyboard musical instruments generally, not just to the two keyboard instruments that the company was manufacturing as of the time of the registration. In addition, the Board found that celestas are close cousins of pianos and that from the outside they look quite similar. The differences between celestas and pianos, the Board found, "are internal, mechanical and perhaps not even noticeable to or known by some consumers of keyboard musical instruments." *Piano Factory*, 2019 WL 4322918, at *9 n.17. In light of the similarity

between pianos and celestas, the Board found that persons seeing the Schiedmayer name on pianos would likely conclude that the pianos were made by or associated with the Schiedmayer companies in general and Schiedmayer Celesta in particular. *Id.* at \*2, \*7–10 n.17.

Both in this case and in previous cases, the Board has made clear that in assessing the "fame or reputation" factor, it is relevant whether the goods or services provided under the registered mark are similar to goods or services associated with the party complaining of a false association. *Id.* at \*8 (citing *Hornby*, 87 U.S.P.Q.2d at 1424, 1426–27; *In re White*, 80 U.S.P.Q.2d 1654, 1658 (TTAB 2006); and *Wielinski*, 49 U.S.P.Q.2d at 1757).

To be sure, a false association claim does not require proof that a prior user's reputation "is closely related to an applicant's goods." *Pedersen*, 109 U.S.P.Q.2d at 1202. Unlike in the case of trademark or trade name infringement, it is enough that the defendant-applicant uses the plaintiff's name to cause a false connection between the plaintiff and the defendant's goods. *Notre Dame*, 703 F.2d at 1376. Nonetheless, as the Board has made clear, similarity between the goods or services offered under the registered mark and the goods or services offered by the party challenging the registration can be highly relevant to a false association claim. *See Hornby*, 87 U.S.P.Q.2d at 1424 ("[I]n the context of the respondent's goods, we must determine whether consumers would view the mark as pointing only to petitioner . . . ."); *Bd. of Trustees of the Univ. of Ala.*, 231 U.S.P.Q. at 411 & n.7; 1 *Handleman's Guide to TTAB Practice* § 5.06[E], at 5-38 ("A false suggestion of a connection claim is particularly strong in cases where the defendant seeks registration of a mark for goods or services that are closely related to the activities for which the plaintiff is known.").

A related principle is that a party's name may be famous among the particular consumers of those goods and

services even if it is not famous among members of the general public. And a party's name may be associated with particular goods such that a false association may be established with goods or services of that type even if it would not have been established with respect to entirely different goods or services. *See In re Nieves & Nieves, LLC*, 113 U.S.P.Q.2d 1629, 1633 (TTAB 2015) (name "Royal Kate" is associated with Kate Middleton with respect to luxury items such as jewelry and handbags because, as a member of the British royal family, she "has become a fashion trendsetter"); *Pedersen*, 109 U.S.P.Q.2d at 1202 ("[I]t is the combination of (1) a name of sufficient fame or reputation and (2) its use on or in connection with particular goods or services that would point uniquely to a particular person or institution."); *U.S. Navy v. U.S. Mfg. Co.*, 2 U.S.P.Q.2d 1254, 1260 (TTAB 1987) (the name USMC is familiar to professionals who purchase prosthetic products); 7 Louis Altman & Mall Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 26.21, at 26-103–04 (4th ed. 2021). In this case, it was reasonable for the Board to consider the issue of the appellee's fame and reputation from the perspective of purchasers of keyboard musical instruments, who would be more likely than the general public to associate Schiedmayer-labeled pianos with the appellee.

Finally, the Board concluded that the evidence justified "draw[ing] an inference that [Sweet 16] intend[ed] to create a connection with [appellee]." *Piano Factory*, 2019 WL 4322918, at \*9 (internal quotation mark omitted); *see also id.* at \*9 n.18. A registrant's intentions in using a mark are relevant to a false association claim. *See Notre Dame*, 703 F.2d at 1377 (Evidence that "Gourmet intended to identify the University," as the University argued, "would be highly persuasive that the public will make the intended false association. The defense that the result intended was not achieved would be hollow indeed."); *Pedersen*, 109 U.S.P.Q.2d at 1202 (Evidence of applicant's intent to identify mark "Lakota" with the Lakota people is "highly

persuasive" evidence of false association.); *In re Peter S. Herrick, P.A.*, 91 U.S.P.Q.2d 1505, 1509 (TTAB 2009) ("[B]ased on applicant's use of a virtually identical seal of the former United States Customs Service in connection with applicant's legal services 'concentrating its legal practice in U.S. Customs law,' we may draw an inference that applicant intends to create a connection with United States Customs and Border Protection."); *Association Pour la Defense et la Promotion de L'Oeuvre de Marc Chagall Dite Comite Marc Chagall v. Bondarchuk*, 82 U.S.P.Q.2d 1838, 1843 (TTAB 2007) ("We infer from the evidence . . . that respondent regarded the name of Marc Chagall as one of significant reputation which would generate good will in the sale of respondent's vodka.  We find this evidence highly persuasive."); *see also Frehling Enters., Inc. v. Int'l Select Grp., Inc.* 192 F.3d 1330, 1340 (11th Cir. 1999) ("If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity.").

In sum, all of the relevant factors—similarity of the goods, recognition among particular consumers, and intent in using the mark—support the Board's finding that the appellee's name was sufficiently well known among consumers of Sweet 16's products that a connection with the appellee would be presumed.  We thus conclude that substantial evidence supports the Board's conclusion on that issue.

\* \* \*

Taking a step back from the doctrinal principles discussed above, a fair characterization of what has gone on in this case is that Sweet 16 has falsely labeled its pianos with a German-sounding name to suggest that its pianos are high-quality European instruments, rather than lower quality instruments made elsewhere.  And in so doing, Sweet 16 has not chosen just some arbitrary German-

sounding name to stencil on its no-name pianos. Instead, it has chosen a name long associated with a German manufacturer of high-end keyboard instruments, a manufacturer that still produces celestas. The inference is inescapable that Sweet 16 is attempting to take advantage of the reputation of Schiedmayer products by suggesting that its Schiedmayer-branded pianos were made by a Schiedmayer company and can therefore be assumed to be of high quality. That is the essence of "falsely suggest[ing] a connection" with another entity under section 2(a) of the Lanham Act. To put the matter succinctly, as the Second Circuit did more than a century ago, "No one has a right to apply another's name to his own goods." *Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407, 410 (2d Cir. 1917).

We uphold the decision of the Board canceling Sweet 16's registration.

**AFFIRMED**