> **This Opinion is a Precedent of the TTAB**

Mailed: November 30, 2021

### UNITED STATES PATENT AND TRADEMARK OFFICE

‒‒‒‒

Trademark Trial and Appeal Board

‒‒‒‒

*In re International Watchman, Inc.*

‒‒‒‒

Serial No. 87302907[1]

‒‒‒‒

John D. Gugliotta of the Law Offices of John D. Gugliotta PE,
    for International Watchman Inc.

Yocheved Bechhofer, Trademark Examining Attorney, Law Office 114,
    Laurie Kaufman, Managing Attorney.

‒‒‒‒

Before Thurmon, Deputy Chief Administrative Trademark Judge, Bergsman and Lykos, Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

International Watchman, Inc. ("Applicant") seeks to register on the Principal

Register the standard character mark NATO for "Canopies comprised primarily of

---

[1] Although this appeal was previously consolidated with Serial Nos. 86719231, 87270077, 87302891, 87302892, 87418153, and 87418156, *see* 10 TTABVUE 4, the Board is issuing separate opinions for each application.

Citations to the prosecution history are to the USPTO's Trademark Status & Document Retrieval ("TSDR") database and identify documents by title and date. Otherwise citations are to TTABVUE, the Board's online docketing system.

tensile fabric membranes; Canopies of textile or synthetic materials; Tents; Tents made of textile materials; Canvas canopies" in International Class 22.[2]

Applicant has appealed the Trademark Examining Attorney's final refusal to register the mark under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that Applicant's mark consists of, or includes matter, which may falsely suggest a connection with the North Atlantic Treaty Organization ("NATO").

The appeal is fully briefed.[3] For the reasons set forth below, we affirm the refusal to register.

## I. Section 2(a) False Suggestion of a Connection

Section 2(a) of the Trademark Act prohibits the registration on either the Principal or the Supplemental Register of a designation that consists of or comprises matter that may falsely suggest a connection with "persons, living or dead,

---

[2] Application Serial No. 87302907, filed January 16, 2017, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), alleging a bona fide intent to use the mark in commerce. During prosecution, the application was abandoned and revived twice due to Applicant's failure to respond to outstanding Office actions. *See* December 11, 2017 and October 11, 2018 Notices of Abandonment.

On March 18, 2017, the prior Examining Attorney approved the application for publication in the *Official Gazette*. However, prior to publication, on April 26, 2017, the Office of the Deputy Commissioner for Trademark Examination Policy restored jurisdiction to the Examining Attorney for consideration of evidence attached to a Letter of Protest. The instant refusal was then issued. To be clear, only the evidence submitted with the Letter of Protest Memorandum *and* relied upon by the Examining Attorney is part of the record. *See In re Info. Builders Inc.*, 2020 USPQ2d 10444, at *5 n.11 (TTAB 2020); *see also* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 1207.06 (2021).

[3] The Board sustains the Examining Attorney's objections to Applicant's materials submitted for the first time with Applicant's appeal brief as untimely. *See* March 11, 2019 Board Order at 11 TTABVUE denying Applicant's request for remand for lack of good cause shown and October 22, 2020 Denial of Applicant's Petition to Reverse the March 11, 2019 Board Order by the Director of the United States Patent and Trademark Office in TSDR. Nonetheless, even if any of the untimely evidence had been made properly of record, the outcome of this appeal would be the same.

institutions, beliefs, or national symbols ... ." 15 U.S.C. § 1052(a). "The rights protected under the § 2(a) false suggestion provision are not designed primarily to protect the public, but to protect persons and institutions from exploitation of their persona." *Bridgestone/Firestone Research Inc. v. Auto. Club de l'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1463-64 (Fed. Cir. 2001) (citing *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, 703 F.2d 1372, 217 USPQ 505, 508-09 (Fed. Cir. 1983)). A person, institution, belief or national symbol does not need to be explicitly protected by statute in order to be protected under Section 2(a). *See, e.g.*, *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 91 USPQ2d 1218 (Fed. Cir. 2009) (holding SHINNECOCK BRAND FULL FLAVOR and SHINNECOCK BRAND LIGHTS, both for cigarettes, falsely suggest a connection with the Shinnecock Indian Nation); *In re Sauer*, 27 USPQ2d 1073 (TTAB 1993) (finding registration of BO BALL for oblong shaped leather ball with white stitching properly refused under Section 2(a), since use of "Bo" would be recognized by purchasers as reference to football and baseball player Bo Jackson, and there was no connection between Jackson and applicant), *aff'd mem.*, 26 F.3d 140 (Fed. Cir. 1994); *In re Jackson Int'l Trading Co. Kurt D. Bruhl GmbH & Co. KG*, 103 USPQ2d 1417 (TTAB 2012) (affirming Section 2(a) refusal to register the stylized mark BENNY GOODMAN COLLECTION THE FINEST QUALITY for fragrances and cosmetics because the mark falsely suggests a

connection with the deceased musician Benny Goodman).[4]

### A. Is the North Atlantic Treaty Organization a "person" or "institution" under Section 2(a)?

A threshold issue before us is whether the North Atlantic Treaty Organization is a "person" or "institution" within the meaning of Section 2(a). Applicant postulates that the North Atlantic Treaty Organization does not fall within the definition of "persons" or "institutions" under Section 2(a), pointing to Article XII of the North Atlantic Treaty, the founding treaty signed by the original member states on April 4, 1949. Article XII states that the North Atlantic Treaty Organization is incapable of being sued, and the individual representatives of its members enjoy broad immunity from prosecution.[5] As further support for its position, Applicant points to a 1954 decision of an Italian tribunal, *Mazzanti v. H.A.F.S.E. and Ministry of Defense, Tribunal of Florence, Italy*, issued on January 2, 1954, which held that the North Atlantic Treaty Organization is not a "juridical person in the eyes of international law."[6]

---

[4] Applicant argues that a statutory prohibition is a prerequisite for finding false suggestion of a connection under Trademark Act Section 2(a). Applicant's Brief, pp. 13-14; 4 TTABVUE 16-17. Applicant is incorrect. It is true that various federal statutes and regulations prohibit or restrict the use of certain words, names, symbols, terms, initials, marks, emblems, seals, insignia, badges, decorations, medals, and characters adopted by the United States government. *See, e.g.*, 36 U.S.C. § 220506 (Olympic, Olympiad, and interlocking rings), 22 U.S.C. § 2518 (Peace Corps), and 18 U.S.C. § 706 (Red Cross). However, such statutory prohibitions are separate and apart from the Trademark Act.

[5] Insofar as the text of the North Atlantic Treaty is not in dispute, the Board takes judicial notice of it. *Cf.* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Chiykowski v. Goldner*, No. 19-cv-2272 (AJN), 2020 BL 202262, 2020 WL 2834225, at *5 n.2 (S.D.N.Y. May 31, 2020) (court took judicial notice of the fact that Canada is a signatory to the Berne Convention).

[6] Applicant's Brief, p. 11; 4 TTABVUE 15.

The Examining Attorney dismisses the Italian court's holding as irrelevant since the United States is not bound by foreign court decisions. However, the Examining Attorney does not take a position on whether the North Atlantic Treaty Organization constitutes a "person" or "juristic person." Rather, the Examining Attorney contends that the North Atlantic Treaty Organization is an "institution," drawing an analogy to *In re N. Am. Free Trade Ass'n*, 43 USPQ2d 1282 (TTAB 1997). That case involved the issue of whether the North American Free Trade Agreement ("NAFTA") fell within the purview of an "institution" within the meaning of Section 2(a). Noting that the "legislative history . . . indicates that the reference to an 'institution' in Section 2(a) was designed to have an expansive scope," the Board held that "NAFTA is an institution, in the same way that the United Nations is an institution." *Id*. at 1285-86. Similarly, the Examining Attorney contends that NATO is analogous to NAFTA because both were created by treaties to which the United States is a member, and thereby bound.

The issue before us is not whether the North Atlantic **Treaty** constitutes a "person" or "institution" within the meaning of Section 2(a); instead, the question we face is whether the North Atlantic Treaty **Organization** falls under either definition. The distinction is critical because the former involves an analysis of the founding treaty whereas the latter implicates an examination of the structure of the institution created by the underlying founding treaty.

Section 45 of the Trademark Act, 15 U.S.C. § 1127, defines "person" and "juristic

person" as follows:

> The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this Act includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law.

Applicant takes the position that the North Atlantic Treaty Organization does not constitute a "juristic person" since it is incapable of being sued or bringing a lawsuit. However, the analysis does not stop there. As the aforementioned language makes clear, "person" merely **includes** "juristic person;" it is not limited solely to a "juristic person."

Consistent therewith, Section 45 also defines "person" to include the United States and its agencies and instrumentalities, as well as any state:

> The term "person" also includes the United States, any agency or instrumentality thereof, or any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States. The United States, any agency or instrumentality thereof, and any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

> The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any non-governmental entity.

While undefined in the statute, the case law makes clear that "institution" is to

be broadly construed. *See In re Shinnecock Smoke Shop*, 91 USPQ2d at 1219 ("[T]he ordinary meaning of 'institution' suggests the term is broad enough to include a self-governing Indian nation") (quoting *Black's Law Dictionary* 813, 1133 (8th ed. 2004) (defining "institution" as "[a]n established organization," and defines "organization" as a "body of persons . . . formed for a common purpose")). Examples of entities previously found to constitute "institutions" include Native American tribes. *See, e.g.*, *Shinnecock Smoke Shop*, 91 USPQ2d at 1220 ("We agree with the Board's conclusion that the Shinnecock Indian Nation is an 'institution' under [Section 2(a)]"); *In re White*, 73 USPQ2d 1713, 1718 (TTAB 2004) ("each federally recognized Apache tribe is necessarily either a juristic person or an institution"). *In re N. Am. Free Trade Ass'n*, 43 USPQ2d at 1286, extends this principle to multilateral bodies created by international treaties:

> NAFTA is not merely a contract or agreement. Rather, it is an original treaty, with three supplemental agreements, between the United States, Canada and Mexico, which sets up a series of relationships between these countries on a number of issues ranging from trade to environmental concerns. Moreover, NAFTA provides for the establishment of a Free Trade Commission, a Secretariat, committees and working groups, binational panels, as well as the establishment of permanent offices in each country. The treaty further provides that the commissions, etc. are to support the work of committees and groups established under NAFTA and resolve disputes between the parties to the agreement.
>
> The totality of NAFTA, thus, is not merely a contract, but it is the treaty, the supplemental agreements, and the various commissions, committees, offices, etc. which are established by those documents. When viewed as this totality, we find that NAFTA qualifies as an "institution" within the meaning of Section 2(a) of the Trademark Act.

As a political and military alliance of the United States and other North American and European countries, the North Atlantic Treaty Organization fits squarely within the category of an "institution" under Section 2(a). The underlying founding treaty, the North Atlantic Treaty (also known as the Washington Treaty) was signed on April 4, 1949.[7] The United States was a signatory to the founding treaty and has been one of the most active members. NATO currently has 28 member countries; each member nation is expected to contribute 2% of its gross national product (GDP) to the Organization's defense budget.[8]

According to the North Atlantic Treaty Organization website (www.nato.int), its political mission is to promote "democratic values" and encourage "cooperation on defense and security issues to build trust … and prevent conflict."[9] It is committed to "peaceful resolution of disputes" with the caveat that if diplomatic efforts fail, the alliance has the authority to conduct "crisis-management operations" either alone or in conjunction with other countries or international organizations.[10] On its own, or under the auspices of other organizations such as the United Nations, the North Atlantic Treaty Organization has participated in military operations in Europe and Asia. For example, the alliance intervened militarily in Bosnia from 1992-1995.[11] It also led a coalition in Afghanistan following the September 11, 2001 terrorist attacks

---

[7] May 13, 2017, Office Action, p. 4 (entry for "North Atlantic Treaty Organization" from THE COLUMBIA ENCYCLOPEDIA retrieved from credoreference.com).

[8] May 13, 2017 Office Action, p. 47 (entry for "NATO" from WIKIPEDIA).

[9] May 13, 2017, Office Action, p. 10 (www.nato.int).

[10] *Id.*

[11] May 13, 2017 Office Action, p. 47 (entry for "NATO" from WIKIPEDIA).

in the United States.[12] The United States, as a member of the North Atlantic Treaty Organization, has participated in many such military endeavors.[13]

In terms of its organization, the North Atlantic Treaty Organization is headquartered in Brussels, Belgium and its highest governing body is the North Atlantic Council headed by a Secretary General.[14] Civilian and military officials from the member states "come to NATO Headquarters to exchange information, share ideas and help prepare decisions, when needed, in cooperation with national delegations and the staff at NATO Headquarters."[15] Its working structures consist of civilian delegations and military representatives with their own designated working groups, committees, and staff.[16] The organizational structure is depicted in the flow chart below:[17]

---

[12] *Id.*

[13] *See, e.g.*, March 6, 2018 Office Action, pp. 7-9 (*New York Times* article entitled "Deadly Taliban Attacks on NATO Convoy and Police in Afghanistan" dated December 17, 2017, discussing the U.S. led coalition in Afghanistan).

[14] May 13, 2017, Office Action, p. 13 (www.nato.int).

[15] *Id.*

[16] *Id.*

[17] *Id.*

Serial No. 87302907



The United States plays an active role in its daily operations. The Military Committee's headquarters are in Washington, D.C. and includes representatives from all member states.[18] As shown in the chart, there are two command structures, one of which, the Allied Command Transformation, is headquartered in Norfolk, Virginia.[19] This provides additional support that American consumers are aware of the North Atlantic Treaty Organization.

This evidence shows that the North Atlantic Treaty Organization qualifies as an "institution" under Section 2(a). As an intergovernmental organization and military alliance, the North Atlantic Treaty Organization is an "institution" as contemplated under Section 2(a). *See In re N. Am. Free Trade Ass'n*, 43 USPQ2d at 1285-86 (finding that the "NAFTA is an institution, in the same way that the United Nations is an institution…"). And while Applicant may be right that the North Atlantic Treaty Organization is not a "juristic person" capable of being sued, this does not diminish its status as an "institution" within the meaning of the statute.

**B. Test for False Suggestion of a Connection under Section 2(a)**

Having established that the North Atlantic Treaty Organization as an "institution" is eligible for protection under Section 2(a), we now apply the four-part test based on the principles articulated by the U.S. Court of Appeals for the Federal Circuit in *University of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, *supra*. To establish that a proposed mark falsely suggests a connection with a person or an

---

[18] May 13, 2017, Office Action, p. 4 (entry for "North Atlantic Treaty Organization" from THE COLUMBIA ENCYCLOPEDIA retrieved from credoreference.com).

[19] *Id.*

institution, it must be shown that:

> (1) The mark is the same as, or a close approximation of, the name or identity previously used by another person or institution;
>
> (2) The mark would be recognized as such, in that it points uniquely and unmistakably to that person or institution;
>
> (3) The person or institution named by the mark is not connected with the activities performed by the applicant under the mark; and
>
> (4) The fame or reputation of the person or institution is such that, when the mark is used with the applicant's goods or services, a connection with the person or institution would be presumed.

*In re Pedersen*, 109 USPQ2d 1185, 1188 (TTAB 2013) (citing in the ex parte context *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imports Co.* for "providing foundational principles for the current four-part test used by the Board to determine the existence of a false connection"); *see also Piano Factory Grp., v. Schiedmayer Celesta GmbH*, 11 F.4th 1363, 2021 USPQ2d 913, at *11 (Fed. Cir. 2021); *The U.S. Olympic Comm. v. Tempting Brands Netherlands B.V.*, 2021 USPQ2d 164, at *17-18 (TTAB 2021); *In re Jackson Int'l Trading Co.*, 103 USPQ2d at 1419; *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428, 429 (TTAB 1985); *In re Cotter & Co.*, 228 USPQ 202, 204 (TTAB 1985).

### 1. Is Applicant's mark NATO the same as or a close approximation of the name or identity previously used by the North Atlantic Treaty Organization?[20]

As noted above, Applicant's applied-for mark is not for the full name of the organization but rather the acronym NATO in standard characters. The common names of and acronyms and terms for U.S. governmental instrumentalities or international organizations may be considered as the names or identities of institutions under Section 2(a). *See In re N. Am. Free Trade Ass'n*, 43 USPQ2d at 1285-86 (finding that the "NAFTA is an institution, in the same way that the United Nations is an institution," and noting that the "legislative history . . . indicates that the reference to an 'institution' in Section 2(a) was designed to have an expansive scope."); *NASA v. Record Chem. Co.*, 185 USPQ 563, 565 (TTAB 1975) (finding NASA's Apollo space program is an institution). *See also Sauer*, 27 USPQ2d 1073 (finding registration of BO BALL for oblong shaped leather ball with white stitching properly refused under §2(a), since use of "Bo" would be recognized by purchasers as reference to football and baseball player Bo Jackson, and there was no connection between Jackson and applicant); *In re Nieves & Nieves LLC*, 113 USPQ2d 1639, 1648 (TTAB 2015) (Board rejected Applicant's argument that because Kate Middleton never used ROYAL KATE to identify herself, the name ROYAL KATE does not point uniquely and unmistakably to Kate Middleton); *Bos. Athletic Ass'n v. Velocity*, 117

---

[20] Implicit in this first requirement is prior use of the applied-for mark by the "person" or "institution." *In re Nuclear Research Corp.*, 16 USPQ2d 1316, 1317 (TTAB 1990). However, since the purpose of Section 2(a) is to protect unauthorized use by another, a term does not have to be used as a technical trademark or trade name by the identified person or institution to warrant protection under Section 2(a). *Univ. of Notre Dame du Lac*, 217 USPQ at 508-09; *Buffett v. Chi-Chi's, Inc.*, 226 USPQ at 429.

USPQ2d 1492, 1494-95 (TTAB 2015) ("The fact that neither BOSTON MARATHON nor MARATHON MONDAY is Opposer's official name is not a dispositive factor. A nickname or an informal reference, even one created by the public, can qualify as an entity's 'identity,' thereby giving rise to a protectable interest.").

The record, which includes evidence from various sources, demonstrates that NATO is a well-recognized acronym for the North Atlantic Treaty Organization. According to three dictionaries, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, MERRIAM-WEBSTER DICTIONARY, and COLLINS DICTIONARY, "NATO" is an acronym for "North Atlantic Treaty Organization."[21] None of these dictionaries provide an alternative meaning. COLLINS further defines "NATO" as "an international organization which consists of the USA, Canada, Britain, and other European countries, all of whom have agreed to support one another if they are attacked."[22] The U.S. Department of State Office of the Historian uses the term NATO interchangeably with North Atlantic Treaty Organization.[23] WIKIPEDIA includes an entry entitled solely "NATO" describing the North Atlantic Treaty Organization's history, participating countries, structure and military operations.[24]

The acronym NATO is also widely used in the media. Online news articles and videos from publications such as the *New York Times*, *Los Angeles Times*, and

---

[21] March 6, 2018 Office Action (entries for "NATO" from www.merriam-webster.com, www.ahdictionary.com, and www.collinsdictionary.com retrieved on February 26, 2018).

[22] *See id.*

[23] May 13, 2017 Office Action, pp. 43-47 (https://history.state.gov/milestones/1945-1952/nato).

[24] May 13, 2017 Office Action, p. 47 (entry for "NATO" from WIKIPEDIA).

*Washington Post* usually refer only to NATO in their headlines or within the article without any mention of the "North Atlantic Treaty Organization." By way of illustration, we highlight the following:

Surk, Barbara. "Russia Stirs Friction in Balkans, as NATO Keeps an Uneasy Peace." *New York Times*, Feb. 19, 2017. Retrieved May 9, 2017 from www.nytimes.com/topic/organization/north-atlantic-treaty-organization.[25]

Associated Press and Reuters. Pence and Merkel on NATO and Russia. *New York Times*, Feb. 18, 2017. Retrieved May 9, 2017 from www.nytimes.com/topic/organization/north-atlantic-treaty-organization.[26]

Cooper, Helene. "Defense Secretary Mattis Tells NATO Allies to Spend More, or Else." *New York Times*, Feb. 15, 2017. Retrieved May 9, 2017 from www.nytimes.com/topic/organization/north-atlantic-treaty-organization.[27]

Reuters. "McCain in Estonia: U.S. Supports NATO." *New York Times*, TimesVideo. Dec. 27, 2016. Retrieved May 9, 2017 from www.nytimes.com/topic/organization/north-atlantic-treaty-organization.[28]

Wilkenson, Tracy. "Tillerson will push NATO allies to 'do more faster.'" *Los Angeles Times*. March 29, 2017. Retrieved May 9, 2017 from www.latimes.com.[29]

Associated Press. "Trump signs off on Montenegro's upcoming entry into NATO." *Los Angeles Times*. April 11, 2017. Retrieved May 9, 2017 from www.latimes.com.[30]

---

[25] *Id.* at 19.

[26] *Id.*

[27] *Id.*

[28] *Id.* at 25.

[29] May 13, 2017 Office Action, p. 33.

[30] *Id.*

> Bennett, Brian. "Trump tweets: On his 'great meeting' with NATO chief." *Los Angeles Times*. April 11, 2017. Retrieved May 9, 2017 from www.latimes.com.[31]
>
> Associated Press. "Stoltenberg: NATO may send many more troops to Afghanistan." *Washington Post*. May 10, 2017. Retrieved May 9, 2017 from www.washington.post.com.[32]
>
> DeBonis, Mike. "Amid Russia tensions Paul Ryan will lead bipartisan delegation to NATO allies." *Washington Post*. April 12, 2017. Retrieved May 9, 2017 from www.washington.post.com.[33]
>
> DeYoung, Karen. "Tillerson to attend rescheduled NATO meeting." *Washington Post*. March 24, 2017. Retrieved May 9, 2017 from www.washington.post.com.[34]

These media excerpts show that the public recognizes NATO as an acronym and shortened form for the North Atlantic Treaty Organization.

In addition, the North Atlantic Treaty Organization's own Twitter handle "NATO (@NATO)" uses the acronym as a self-identifier.[35] Such use in social media lends further support for the finding that the public understands the significance and meaning of NATO as a designation for the North Atlantic Treaty Organization. *See* TBMP § 1208.03 ("The Board may consider evidence obtained from social media sites such as Facebook, Twitter, Instagram, and LinkedIn"). *Cf. In re DePorter*, 129 USPQ2d 1298, 1299-1307 (TTAB 2019) (Board considered widespread use by

---

[31] May 13, 2017 Office Action, p. 34.

[32] May 13, 2017 Office Action, p. 40.

[33] May 13, 2017 Office Action, p. 41.

[34] *Id.*

[35] May 13, 2017 Office Action, p. 38.

many third parties of #MAGICNUMBER108 on social media such as Twitter and Instagram as evidence of consumer perception of proposed mark as an informational message not a source identifier); *In re Adlon Brand GmbH & Co.*, 120 USPQ2d 1717, 1720 (TTAB 2016) (Board considered social media evidence relating to individuals bearing the surname Adlon because "they illustrate the ways in which members of the public may be exposed to people who bear the surname ADLON.").

Applicant throughout its brief refers to the North Atlantic Treaty Organization or NATO as the Organisation du traité de l'Atlantique nord or OTAN, the French language equivalent. Indeed, Applicant opens its main appeal brief with the assertion that "[t]he present application was Finally Rejected on 03/06/2018 as including subject matter that may falsely suggest a connection with the Organisation du Trait de l'Atlantique Nord (OTAN) aka North Atlantic Treaty Organization."[36] Applicant goes on to argue that its applied-for mark "lacks similarity of commercial impression as compared with the Organisation du Trait de l'Atlantique Nord (OTAN)."[37] This mischaracterizes the Examining Attorney's refusal in this case. Nowhere does the Examining Attorney state in the prosecution history or on appeal that registration was refused under Section 2(a) in this particular case based on a connection with the Organisation du Trait de l'Atlantique Nord or OTAN, the French language name of the North Atlantic Treaty Organization or NATO. The institution referred to in the applied-for mark is NATO, not OTAN.

---

[36] Applicant's Appeal Brief, p. 1; 4 TTABVUE 4.

[37] *Id.* at 4; 4 TTABVUE 7.

The first requirement is therefore satisfied: the pervasive use of NATO in a variety of sources as shorthand for "North Atlantic Treaty Organization" demonstrates that Applicant's applied-for mark is the same as or a close approximation of the name or identity previously used by the North Atlantic Treaty Organization.

### 2. Does Applicant's NATO mark point uniquely and unmistakably to the North Atlantic Treaty Organization?

Applicant argues that the mark NATO does not point uniquely and unmistakably to the North Atlantic Treaty Organization, noting use by other unrelated entities of the abbreviation NATO as a shortened form for the name of their own organizations. Applicant also points to other trademark and service mark usage of the term based on Internet searches from various platforms. As Applicant contends, "[g]iven such a huge variety of meanings to choose from, the term NATO would NOT be recognized as uniquely **pointing and unmistakably** to…(OTAN) aka" the North Atlantic Treaty Organization or NATO.[38] (emphasis in original)

The requirement that the proposed mark would be recognized as pointing uniquely and unmistakably to the person or institution does not mean that the term itself must be unique. Rather, the question is whether, as used on the goods or services in question, consumers would view the mark as pointing uniquely to the relevant person or institution, or whether they would perceive it to have a different meaning. *See Hornby v. TJX Cos.*, 87 USPQ2d 1411, 1427 (TTAB 2008) (in granting

---

[38] Applicant's Brief, p. 9; 4 TTABVUE 13.

the petition to cancel registration of the mark TWIGGY, Board found that, at the time of registration in 2000, the mark TWIGGY on children's clothing would be recognized as pointing uniquely and unmistakably to petitioner, who was recognized as a famous British model, and that consumers would presume an association with petitioner).

In addition, third-party use of a term for other goods or services unrelated to those at issue does not in and of itself establish that that the term does not point uniquely or unmistakably to a particular person or institution. *In re Pedersen*, 109 USPQ2d at 1196 (finding consumer exposure to third-party use of LAKOTA on products and services unrelated to applicant's insufficient to show that applicant's use of LAKOTA does not point uniquely to the Lakota people); *Hornby v. TJX Cos.*, 87 USPQ2d at 1427 (finding evidence of third-party registrations showing registration of the term "TWIGGY" for goods unrelated to children's clothing to have "no probative value").

The evidence discussed above demonstrates that NATO has been in widespread use as an acronym for the North Atlantic Treaty Organization since its inception following World War II. Notably, none of the dictionary entries for "NATO" from MERRIAM-WEBSTER, AMERICAN HERITAGE DICTIONARY, OXFORD DICTIONARY, and COLLINS include alternative meanings. Likewise, the media evidence shows extensive use of the term NATO without any mention of the "North Atlantic Treaty Organization."

Consumers would view Applicant's mark as pointing "uniquely and unmistakably" to NATO. Applicant's International Class 22 goods include "tents" and

"tents made of textile materials," items used by military personnel in the performance of their duties and during combat. By way of illustration, the record includes a photo of a tent used to house NATO soldiers in Camp Basion, Afghanistan:[39]



In addition to using tents for its own personnel, NATO provides tents to refugees as part of disaster relief missions.[40]

In terms of the U.S. consumer market, the Examining Attorney also made of record an excerpt from www.gumotex.com, an online retailer offering for sale an HF-

---

[39] March 6, 2018 Office Action, p. 24 (stock photo retrieved from www.alamy.com).

[40] March 6, 2018 Office Action, p. 23 (article entitled "NATO Joins Forces with UNHCR to Airlift Urgently Needed tents to Pakistan" dated October 18, 2005 from the UNHCR United Nations Refugee Agency web site, www.unhr.org).

46A Army Tent. This model is touted as "meeting NATO military standards … The Czech army contributed to the development of this tent with its suggestions, and it is also possible to equip it with catalogue accessories that meet military standards:[41]



The record also includes an excerpt from MidwayUSA, a direct-to-consumer online specialty retailer targeting outdoor enthusiasts, reproduced below, offering for sale NATO surplus tents.[42]

---

[41] March 6, 2018 Office Action, p. 2 (excerpt from www.gumotex.com retrieved on February 26, 2018).

[42] March 6, 2018 Office Action, p. 24 (excerpt from www.keepshooting.com).



Given that NATO is a military alliance that has been actively involved in military operations, consumers are likely to assume that "tents" and "tents made of textile materials" bearing the NATO trademark have the North Atlantic Treaty Organization's imprimatur. Indeed, first responders searching for high quality tents and camping enthusiasts would be enticed by any implied NATO sponsorship.

Applicant, relying on *Bos. Athletic Ass'n v. Velocity, LLC*, 117 USPQ2d 1492, 1496-99 (TTAB 2016), argues that because in that case frequent third-party uses of MARATHON MONDAY undermined a showing that the term pointed uniquely and unmistakably to opposer's identity, the Boston Marathon race, the same result must obtain here.[43] We disagree. This aspect of the Section 2(a) analysis is fact specific and

---

[43] Applicant also points to a non-precedential opinion, *U.S. Marine Corps v. Peter J. Healy*, Opposition No. 91215087 (TTAB April 25, 2017) where the Board dismissed the opposer's false suggestion of a connection claim under Section 2(a) involving the mark MARINE ONE DOWN. Given the distinctions in the issues and factual record, we find this case to be of little relevance to the ex parte appeal before us. *See In re tapio GmbH*, 2020 USPQ2d 1138, at *8

involves an analysis of the particular record before us. We therefore cannot extrapolate from the determination in *Bos. Athletic Ass'n v. Velocity*, that the same conclusion is warranted here.

We therefore find that the record shows that Applicant's NATO mark points uniquely and unmistakably to the North Atlantic Treaty Organization. The fact that the record lacks evidence specifically directed to the remaining goods in International Class 22, "canopies comprised primarily of tensile fabric membranes; canopies of textile or synthetic materials; … canvas canopies" does not alter our determination. Section 2(a) prohibits registration of a mark that falsely suggests a connection with "persons, living or dead, institutions, beliefs, or national symbols." 15 U.S.C. § 1052(a). Because the statute is silent as to goods or services, we can infer that this prohibition applies if any of the goods or services listed in a particular class falsely suggest a connection. We therefore hold that false suggestion of a connection may be found as to an entire class on the basis of any one item listed within the identification of goods in that class. *See Piano Factory Grp.*, 2021 USPQ2d 913 at *14-15 ("[A] party's name may be associated with particular goods such that a false association may be established with goods or services of that type even if it would not have been established with respect to entirely different goods or services." [keyboard musical instruments in general associated with a manufacturer of celestas]). *Cf. Tuxedo*

___

n.34 (TTAB 2020) (Board found unpersuasive non-precedential decisions decided on different records); *In re Society of Health and Physical Educators*, 127 USPQ2d 1584, 1587 n.7 (TTAB 2018) ("Board decisions which are not designated as precedent are not binding on the Board, but may be cited and considered for whatever persuasive value they may hold.").

*Monopoly Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (likelihood of confusion must be found as to the entire class if there is any confusion with respect to any good or service that comes within the identification in that class); *In re Stereotaxis Inc.*, 429 F.3d 1039, 77 USPQ2d 1087, 1089 (Fed. Cir. 2005) (quoting *In re Richardson Ink Co.*, 511 F.2d 559, 185 USPQ 46, 48 (CCPA 1975) ("Our predecessor court ... has stated that 'registration should be refused if the mark is descriptive of any of the goods [or services] for which registration is sought.'")). As such, the second requirement has also been met.

### 3. Is the North Atlantic Treaty Organization connected with the goods that are or will be sold under Applicant's NATO mark?

Applicant admits that the North Atlantic Treaty Organization has no connection with the goods Applicant sells under its applied-for mark.[44] This part of the test—which focuses on the requirement in Section 2(a) that the suggestion of a connection be false—is therefore satisfied.[45]

---

[44] *See* Applicant's Brief, p. 21; 4 TTABVUE 24.

[45] In its Reply Brief, Applicant argues that the entity or individual who filed the Letter of Protest also had no connection with the North Atlantic Treaty Organization and lacked "standing" as a "non-interested interloper." Reply Brief, p. 4; 15 TTABVUE 5. Any third party may submit by letter of protest objective evidence for consideration relevant to examination for a ground for refusal of registration under Trademark Rule 2.149, 37 C.F.R. § 2.149. *See* TMEP § 1715. This has no relevance as to whether Applicant's goods bear any connection to NATO. As evidence that NATO is not famous, Applicant further points to the fact that the Office only issued a Section 2(a) refusal after the Letter of Protest was filed. To draw such an inference would be tantamount to disregarding the evidentiary record of fame before us.

**4. Is the North Atlantic Treaty Organization's name or identity of sufficient fame or reputation that when Applicant's mark NATO is used on Applicant's goods, a connection with the North Atlantic Treaty Organization would be presumed?**

Applicant questions NATO's fame, and argues that its own use of NATO as a trademark to identify its goods will not create an association with the North Atlantic Treaty Organization, because no products can actually be purchased by consumers from the Organization. As Applicant contends, the Treaty is "directed towards mutual national defense and not the sale, manufacture, offer for sale, or transmission of any of the goods in the present application[s]," so the North Atlantic Treaty Organization's use of the term cannot possibly have a commercial impression.[46]

There is no prerequisite that the institution or person actually provide the goods in order to find that an applicant's mark creates a false suggestion of a connection. Nor does it "require proof that a prior user's reputation 'is closely related to an applicant's goods.'" *Piano Factory Grp.*, 2021 USPQ2d at \*14 (quoting *Pedersen*, 109 USPQ2d at 1202). However, it is relevant whether an applicant's goods are similar to goods associated with the person or institution implicated in a false suggestion of an association refusal. *See id.* As long as an applicant's goods are of a type that consumers would associate in some fashion with the named person or institution, and the named party is sufficiently famous, then it may be inferred that purchasers of the goods or services would be misled into making a false connection of sponsorship, approval, support or the like with the named party. *See, e.g., In re Nieves & Nieves*,

---

[46] Applicant's Brief, p. 3; 4 TTABVUE 6.

113 USPQ2d at 1647-48 (holding ROYAL KATE used with applicant's consumer products, including fashion products, suggested a connection with Kate Middleton would be inferred because evidence showed that Kate Middleton, by virtue of being the wife of Prince William of the British Royal family, has become a celebrity and fashion trend-setter the media reports on, including the clothes she wears, what she does, and what she buys); *In re Cotter & Co.*, 228 USPQ at 204-05 (holding WESTPOINT used with applicant's firearms suggested sponsorship, approval, support or the like from West Point because evidence showed that West Point is a well-known U.S. Military Academy). With regard to the fame aspect, the record clearly establishes NATO's fame as a landmark political and military alliance. According to the U.S. Department of State Office of the Historian, "Milestones in the History of U.S. Foreign Relations" include the creation of NATO:

> NATO was the first peacetime military alliance the United States entered into outside of the Western Hemisphere. After the destruction of the Second World War, the nations of Europe struggled to rebuild their economies and ensure their security. The former required a massive influx of aid to help war-torn landscapes re-establish industries and produce food, the latter required assurances against a resurgent Germany or incursions from the Soviet Union. …
>
> …
>
> In 1947-1948, a series of events caused the nations of Western Europe to become more concerned about their physical and political security and the United States to become closely involved with European affairs. The ongoing civil war in Greece, along with tensions in Turkey, led President Harry S. Truman to assert that the United States would provide economic and military aid to both countries, as well as any other nation struggling against an attempt at subjugation. … The Berlin Crisis brought the United States and the Soviet Union to the brink of conflict,

> although a massive airlift to resupply the city for the duration of the blockade helped to prevent an outright confrontation.
>
> …
>
> Soon after the creation of the North Atlantic Treaty Organization, the outbreak of the Korean War led the members to move quickly to integrate and coordinate their defense forces through a centralized headquarters. …
>
> …
>
> The collective defense arrangements in NATO served to place the whole of Western Europe under the American "nuclear umbrella." …
>
> Although formed in response to the exigencies of the developing Cold War, NATO has lasted beyond the end of that conflict, with membership even expanding to include some former Soviet states.[47]

Not only has NATO played a prominent role in history, it has been described as the world's "largest peacetime military alliance."[48] The dictionary entries for "NATO" discussed above show that NATO has become part of our ordinary lexicon; this fact is reinforced by the widespread reporting of NATO activities in the media. *Cf. B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 6 USPQ2d 1719, 1720 (Fed. Cir. 1988) ("When a trademark attains dictionary recognition as part of the language, we take it to be reasonably famous."). Given its historical and present significance in international affairs, NATO's fame is well-established.

---

[47] May 13, 2017 Office Action, pp. 43-47 (U.S. Department of State Office of the Historian, "Milestones in the History of U.S. Foreign Relations" at https://history.state.gov/milestones/1945-1952/nato accessed on May 12, 2017).

[48] *Id.* at 47.

As far as the goods are concerned, as explained earlier, military personnel are housed in tents, and third-party specialty retailers advertising the goods for sale tout the quality of these products used by NATO forces. For these reasons, the evidence demonstrates that Applicant's tents identified in International Class 22 are the type of items consumers would associate with the military. As NATO is a military alliance with active duty soldiers, consumers would associate such goods with NATO.

Given NATO's fame and prominent role as an intergovernmental military alliance, prospective consumers encountering "tents" and "tents made of textile materials" bearing the trademark NATO would falsely assume sponsorship or approval by, or connection with the North Atlantic Treaty Organization. Accordingly, the final prong has been satisfied.

## II.    Preclusive Effect of a Prior Registration

As a defense, Applicant invokes the doctrines of res judicata and collateral estoppel. It asserts that because it previously obtained a trademark registration for the same mark for explosives and ammunition in International Class 13, the present Section 2(a) refusal should be reversed. According to Applicant:

> The present Applicant has previously registered Registration Number 4795590 for NATO in Class 013 for "Explosives; airsoft rifles and guns not for recreational use, bb guns; pellet guns; magazines for weapons; loading clips for small arms; fireworks; gun cases; bipods for weapons; holsters." During the course of the examination for that registration, the Examining Attorney initially rejected that application over the same grounds, i.e. Section 2(a), false association. However, that Examining Attorney, provided with some, but not all of the Applicant's support materials filed with this Appeal Brief, still properly reversed this initial determination and ultimately issued that

application. Applicant contends that the same result is proper here in this Application.[49]

A prior adjudication, including a Board decision, may be dispositive of a later application for registration of the same mark on the basis of the same facts and issues, under the doctrines of res judicata[50] or collateral estoppel.[51] *In re SolarWindow Technologies, Inc.*, 2021 USPQ2d 257 (TTAB 2021). *See generally* TMEP § 1217 and authorities cited therein. Prior adjudications include Board decisions or decisions by a reviewing court. *Id.* The allowance of a trademark application by an Examining Attorney is not a final decision on the merits from a prior adjudication and is, therefore, not a basis for res judicata or collateral estoppel.

It is well settled, however, that the USPTO is not bound by a decision of a Trademark Examining Attorney who examined and allowed the application for Applicant's previously registered mark, based on a different record. *See In re Cordua*

---

[49] Applicant's Brief, p. 15; 4 TTABVUE 18. Although this registration was not made of record, because the Examining Attorney referred to the registration in briefing the appeal, we treat the registration as though it is of record. *See In re Olin Corp.*, 124 USPQ2d 1327, 1335 n.22 (TTAB 2017) (although the Board does not take judicial notice of registrations, because the examining attorney addressed applicant's registrations in her brief and neither objected to the discussion of the other, Board treated both registrations as though they are of record); *see also* TBMP § 1208 ("Treatment of Evidence") and TMEP § 1501.02(b) ("Examining Attorney's Appeal Brief").

[50] Under the doctrine of claim preclusion or res judicata, "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *In re Bose Corp.*, 476 F.3d 1331, 81 USPQ2d 1748, 1752 (Fed. Cir. 2007) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)).

[51] Collateral estoppel, or issue preclusion, applies where: "(1) a prior action presents an identical issue; (2) the prior action actually litigated and adjudged that issue; (3) the judgment in that prior action necessarily required determination of the identical issue; and (4) the prior action featured full representation of the estopped party." *Stephen Slesinger Inc. v. Disney Enter. Inc.*, 702 F.3d 640, 105 USPQ2d 1472, 1474 (Fed. Cir. 2012).

*Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016) ("The PTO is required to examine all trademark applications for compliance with each and every eligibility requirement … even if the PTO earlier mistakenly registered a similar or identical mark suffering the same defect."). Trademark rights are not static, and eligibility for registration must be determined on the basis of the facts and evidence of record that exist at the time registration is sought. *See In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9 (CCPA 1982); *In re Thunderbird Prods. Corp.*, 406 F.2d 1389, 160 USPQ 730 (CCPA 1969).

## III.    Conclusion

Considering all of the evidence in the record, we find that (i) Applicant's applied-for mark NATO is a close approximation of the North Atlantic Treaty Organization's identity, (ii) the mark NATO points uniquely and unmistakably to the North Atlantic Treaty Organization, (iii) the North Atlantic Treaty Organization has no connection with Applicant, and (iv) the North Atlantic Treaty Organization is of sufficient fame or reputation that if Applicant's mark NATO were used in connection with the identified tents, and by implication all of the goods identified in International Class 22, a connection with the North Atlantic Treaty Organization would be presumed. In addition, neither res judicata nor collateral estoppel require a different result in this case. Therefore, we find that Applicant's mark NATO for the goods identified in International Class 22 falsely suggests a connection with the North Atlantic Treaty Organization.

**Decision**: The refusal to register under Section 2(a) is affirmed.